UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MEDLINE INDUSTRIES, LP,  )
                                   )
                      Plaintiff,  )
                                   )
v.  )         Civil Action No. 1:20-cv-03981-JPB
                                   )
                                   )
C.R. BARD, INC.,  )
                                   )
                   Defendant.  )

**SPECIAL MASTER'S REPORT AND RECOMMENDATION
REGARDING CLAIM CONSTRUCTION**

Pursuant to this Court's Order dated November 30, 2022, the following is
the Report and Recommendation from the undersigned Special Master regarding
claim construction of the patent-in-suit, U.S. Patent No. 8,448,786, "Catheter Tray,
Packaging System, Instruction Insert, and Associated Methods" (the "'786
Patent").  Plaintiff, Medline Industries, LP, has accused Defendant, C.R. Bard,
Inc., of indirectly infringing Claim 1 of the '786 Patent by inducing direct
infringement in violation of 35 U.S.C. § 271(b) and contributing to direct
infringement in violation of 35 U.S.C. § 271(c).

## Background

The '786 Patent relates to a method of using a catheterization kit comprising a single-layer catheter tray, along with related medical devices and an instruction manual, which reduces the risk of catheter-associated urinary tract infections ("CAUTIs"). In 2014, Defendant began selling a single-layer catheter tray called the Original SureStep Foley Kit. On May 16, 2014, Plaintiff filed a Complaint for Patent Infringement in the Northern District of Illinois asserting, among other things, that Defendant's Original SureStep Foley Kit infringed Claim 1 of the '786 Patent. *See Medline Industries, Inc. v. C.R. Defendant, Inc.*, No. 1:14-cv-03618-JZL-MDW (N.D. Ill) (the "*Medline I*" case).

In 2016, Defendant began selling its Redesigned SureStep Foley Kit, but Plaintiff never amended its Final Infringement Contentions in *Medline I* to identify the Redesigned SureStep Foley Kit as an infringing product. Therefore, in August 2020, the *Medline I* court ruled that Plaintiff's infringement claims were limited to the Original SureStep Foley Kit only. On September 25, 2020, Plaintiff filed its Complaint against Defendant in this Court asserting that the Redesigned SureStep Foley Kit infringes upon Claim 1 of the '786 Patent.

In accordance with the Local Patent Rules, the parties submitted their Supplemental Joint Claim Construction Statement (Doc. 70)), Opening Briefs (Docs. 73, 74) and Responsive Briefs (Docs. 76, 77). Arguments were presented at

a hearing on February 15, 2022, regarding the respective construction of the disputed claim terms/phrases. Subsequent to the hearing, the Special Master requested briefing on the level of skill in the art of the invention claimed in the '786 Patent. (Docs. 129-132). This Report and Recommendation follows a careful review of the respective pleadings on claim construction and skill in the art, as well as the parties' presentations at the hearing.

## Claim Construction Standard

It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). The purpose of claim construction is to give claim terms the meaning understood by a person of ordinary skill in the art at the time of the invention. *Phillips*, *supra* at 1312-14. The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman v. Westview Instruments, Inc.,* 517 U. S. 370, 372 (1996). During a *Markman* determination, "[i]n construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point out and distinctly claim the subject matter which the patentee regards as his

3

invention.'" *Interactive Gift Express, Inc. v. CompuServe Inc.,* 256 F.3d 1323,

1331 (Fed. Cir. 2001).

As is stated in *Canvs Corp. v. United States*, 126 Fed. Cl. 106, 112-113

(2016):

> When construing patent claims, the court looks first to intrinsic
> evidence, then if needed, to extrinsic evidence. *Suffolk Techs., LLC v.*
> *AOL Inc.,* 752 F. 3d 1358, 1362 (Fed. Cir. 2014) ("After considering
> this intrinsic evidence, a court may also seek guidance from extrinsic
> evidence such as expert testimony, dictionaries, and treatises.") (citing
> *Phillips*, 415 F. 3d at 1317-18). Intrinsic evidence includes the patent
> claims and specification as well as the patent prosecution file history.
> This evidence "is the most significant source of the legally operative
> meaning of disputed claim language." *Vitronics Corp. v.*
> *Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing
> *Markman,* 52 F.3d at 979). . . .

Generally, the words of a claim are given their ordinary and customary

meaning, which is "the meaning that the term would have to a person of

ordinary skill in the art in question at the time of the invention. . . ." *Phillips*,

*supra* at 1312-13. The person of ordinary skill in the art is deemed to read

the claim terms in the context of the entire patent, including the specification,

rather than solely in the context of the particular claim in which the disputed

term appears. *Phillips*, *supra* at 1313.

There is a "heavy presumption in favor of the ordinary meaning of claim

language as understood by one of ordinary skill in the art." *Johnson Worldwide*

*Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 990 (Fed. Cir. 1999). The "only two

4

exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning are: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).

In some instances, the meaning of a claim term as understood by one of skill in the art "may be readily apparent even to lay judges and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, *supra* at 1314. "[T]he claims themselves provide substantial guidance as to the particular claim terms." *Id.* Both "the context in which a term is used in the asserted claim" and the "[o]ther claims of the patent in question are useful for understanding the ordinary meaning." *Id.* The specification is "always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, *supra* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In short, the claims "must be read in view of the

specification, of which they are a part." *Markman, supra* at 979.

In construing claim terms, the court should also consider the patent's prosecution history, another component of the intrinsic evidence used to supply the proper context for claim construction. *Markman, supra* at 1317 ("Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."). Unlike the specification, the prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation." *Id.* For that reason, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Nonetheless, under the doctrine of prosecution disclaimer, the inventor may have limited the invention during prosecution, making the claim scope narrower than it would otherwise be according to the claim language itself. *Id.; see, also Chimie v. PPG Indus., Inc.,* 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." (Internal quotation marks omitted)).

The Court may also rely on extrinsic evidence which consists of all evidence external to the patent and prosecution history. *Phillips, supra* at

1317.  However, the weight given to the extrinsic record is "less significant than [that given to] the intrinsic record." *Id.*

Therefore, an analysis of intrinsic evidence is usually sufficient to construe a disputed claim term, and if the intrinsic evidence is sufficient to resolve disputed claim terms, "reliance on any extrinsic evidence is improper." *Id.; see also Vitronics, supra* at 1584 ("Only if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court have resorted to extrinsic evidence . . . ."); *Boss Control, Inc. v. BomDefendantier, Inc.*, 410 F.3d 1372, 1377 (Fed. Cir. 2005).

All of the sources of evidence discussed above have their advantages and drawbacks and varying amounts of persuasive force.  There is no "rigid algorithm" or "sequence of steps" which the court must follow in considering these sources of evidence.  *Phillips, supra* at 1321.  All that matters "is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.*

Finally, "the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243,

1248 (Fed. Cir. 1998) (citations omitted).  "[T]he resulting claim interpretation must, in the end, accord with the words chosen by the patentee to stake out the boundary of the claimed property." *Id.*

## Qualifications of One of Ordinary Skill in the Art

"One must bear in mind . . . that patents are 'not addressed to lawyers, or even to the public generally,' but rather to those skilled in the relevant art." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909 (2014); *see also*, *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention."). This inquiry "provides an objective baseline from which to begin claim interpretation." *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1372–73 (Fed. Cir. 2005) (quoting *Phillips*, *supra* at 1313). That person of ordinary skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent," including the specification and the prosecution history. *Phillips*, *supra* at 1313. The level of skill in the art is "a prism or lens" through which a judge or juror views the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

Defendant, in its opening claim construction brief at page 6 (Doc. 74-4,

para. 29), proposed that "[f]or the '786 patent, a person of ordinary skill in the art would be an individual with a bachelor's degree in mechanical engineering or equivalent technical degree and at least two years of experience in the medical device field."  In its Response Brief, Plaintiff stated that "[f]or the purposes of claim construction, Medline has no dispute with Bard's definition." Doc. 76, at p. 4.  As to why its agreement with Defendant's definition was limited only to claim construction, Plaintiff explained that "claim construction [is] the matter that is before the Special Master at present. . . . [T]he Special Master need not, and should not, address at this time the level of ordinary skill for any other purpose. . . . [But] if this case proceeds beyond claim construction to expert discovery, Medline expects its experts to opine that the person of ordinary skill is a member of a team that includes both a clinical member and an engineering or design member, each with particular training and experience."  Plaintiff's Opening Brief, at p. 1 (Doc. 129).

Plaintiff asserts that the level of ordinary skill for purposes other than claim construction should not be determined at this time, because the "scope of the Court's referral to the Special Master does not include determining the level of ordinary skill for purposes other than claim construction." *Id.* at p. 5.  This Court may have thought that it wasn't necessary in its referral to so limit such

determination to claim construction in view of Local Patent Rule 6.1(a) which requires the parties to include, with their list of disputed claim terms, "the qualifications of a person of ordinary skill in the art at the time of the invention(s) of the patent(s)-in-suit."  Plaintiff, *sua sponte,* has added a disclaimer to Local Patent Rule 6.1 that those qualifications are only "for the purposes of claim construction" but does not explain why the level of ordinary skill would necessarily have to change from one stage of litigation to the next.  Nor, if Plaintiff "expects" to define the person of ordinary skill in the art as a "team" consisting of a clinician and an engineer or designer, Plaintiff does not explain why it doesn't propose that definition now, pursuant to Local Patent Rule 6.1(a).

Plaintiff further asserts that the "level of ordinary skill for purposes other than claim construction is not ripe for decision in this case." *Id.* at p. 7.  The level of skill will subsequently be "ripe" in this matter if the parties, as is their wont, file motions for summary judgment of invalidity and/or infringement. *See, e.g.,* the following motions filed in the *Medline I* action:  Defendant's Motion for Summary Judgment of Anticipation of Claim 1 of the '786 Patent and Plaintiff's Opposition to Defendant's Motion for Summary Judgment of Anticipation of Claim 1 of the '786 Patent and Plaintiff's Cross-Motion for Summary Judgment

of Infringement, on Defendant's Anticipation Defense *et al.*, *Medline I,* Docs. 545
and 526, respectively.

It may well be that any determination of the level of ordinary skill in this
matter at this time may subsequently change if the Court finds, for whatever
reason, it becomes necessary to revisit that issue as the case progresses. "[Courts]
may engage in a rolling claim construction, in which the court revisits and alters its
interpretation of the claim terms as its understanding of the technology evolves."
*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1361 (Fed. Cir.
2002) (citation omitted); *see, also, GE Lighting Sols., LLC v. AgiLight, Inc.*, 750
F.3d 1304, 1310 (Fed. Cir. 2014); and *CytoLogix Corp. v. Ventana Med. Sys., Inc.,*
424 F.3d 1168, 1172 (Fed. Cir. 2005) ("[T]he district court has considerable
latitude in determining when to resolve issues of claim construction."). A "rolling
construction" of the level of ordinary skill in the art, if it did occur in this case,
would be similar to what the *Medline I* Court did when it modified its construction
of the "catheter assembly" term as that case progressed, as discussed *infra.*

In its Opening Brief, at p. 11 (Doc. 129), Plaintiff states that it "reserves all
rights to argue, at an appropriate time, for a different level of ordinary skill with
respect to other issues in this case, such as obviousness." But, having said that,
Plaintiff goes on to state that "[i]f this case proceeds through expert discovery,
Medline expects its experts to offer opinions consistent with those they offered in

11

*Medline I*, including with respect to the level of ordinary skill in the art." *Id.* at p.

12. Therefore, this Court may not need to consider subsequently a "rolling"

determination of the level of skill in the art.

Plaintiff's "expected" person of ordinary skill in the art comprises a team of

an engineer and a clinician, specifically

> someone with a degree of Bachelor of Science in Nursing or
> an Associate's degree in nursing, as well as two years of
> experience inserting indwelling and/or intermittent catheters
> in a medical setting. . . . and someone with alternatively (1) a
> Bachelor of Science in mechanical or packaging engineering,
> or a degree in industrial design, or (2) a bachelor's degree in
> another technical field and about two years' experience in the
> packaging of medical devices.

Plaintiff's Opening Brief, at p. 15 (Doc. 129).

Since the parties agree that an engineer would be a person of ordinary skill

in the art, then the issue is whether there should also be included a clinician. There

is authority that a person of ordinary skill in the art can be a team of individuals, as

Plaintiff proposes. *See, e.g.*, *Indivior Inc. v. Dr. Reddy's Labs*, 930 F.3d 1325,

1343-45 (Fed. Cir. 2019).

Plaintiff asserts that "a perquisite to determining the level of ordinary skill is

to identify the field of the invention." Plaintiff's Response Brief, at p. 3 (Doc.

132). However, under the heading "Technical Field," the '786 Patent states that

"[t]his invention relates generally to storage containers for medical devices, and

more particularly to a storage container for a long, flexible medical implement,

such as a catheter, and related medical devices, as well as an instruction manual included therewith." Col. 1, l. 28-33.  While it is true that, as Plaintiff contends, "the kits . . . are designed for use by clinicians and for the purpose of alleviating problems that clinicians face. . .," the '786 Patent considers the field of the invention to be "storage containers for medical devices."

The fact that a clinician is the end user of the "catheter package assembly" claimed in Claim 1 of the '786 Patent does not necessarily make that clinician a person of ordinary skill in the art of "storage containers for medical devices." Defendant cites the deposition of one of the co-inventors of the '786 Patent who is not a clinician and who stated that she had "conversations with customers and clinicians, infection preventionists," on ways to eliminate or at least reduce CAUTIs "[a]nd so I went forward with that idea, how do we help clinicians help hospitals reduce the incidence of catheter-associated urinary tract infections. " Defendant's Supplemental Opening Brief Regarding Level of Ordinary Skill, Exh. 4, p. 32, l. 12 – p. 33, l. 6.  Thus, Defendant's proposed engineer, in consultation with one or more practitioners familiar with catheterization procedures, can be the person of ordinary skill in the relevant art.

As noted, Defendant's person of ordinary skill in the art has "a bachelor's degree in mechanical engineering or equivalent technical degree and at least two years of experience in the medical device field."  However, a construction that

more naturally aligns with the '786 Patent's description of the invention and Claim

1 would be to modify the phrase "medical device field" to read "medical device

<u>packaging</u> field." Neither party proposed that construction but just as a court may

arrive at its own constructions of claim terms even if they differ from the

constructions proposed by the parties,[1] so should a court be able to arrive at its own

construction of the qualifications of a person of ordinary skill in the art.

Therefore, it is recommended that the qualifications of a person of ordinary

skill in the art by the relevant time of the '786 Patent are -- *one who would have a*

*bachelor's degree in mechanical engineering or equivalent technical degree and at*

*least two years of experience in the medical device packaging field* --.

---

[1] "[T]he trial judge has an independent obligation to determine the meaning of claims, notwithstanding the views asserted by the adversary parties." *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995), *cert. denied*, 518 U.S. 1020 (1996); *Pediatric Medical Devices, Inc. v. Indiana Mills & Mfg., Inc.*, 961 F. Supp.2d 1241, 1245 (N.D. Ga. 2013) ("[I]n construing the claims, the Court [is] not restrained by the parties' proffered constructions.").

14

## Claim 1 of the '786 Patent

Claim 1 reads as follows, with the disputed terms in bold:

1.      A method of using a catheter package assembly, comprising:
opening a thermally sealed bag disposed about a tray having a **catheter assembly** disposed therein;
accessing an instruction manual;
unfolding one or more layers of wrap to **reveal an additional layer of wrap and the catheter assembly**; and
placing one of the one or more layers of wrap or the additional layer of wrap beneath a patient, thereby transforming an area beneath the patient from a non-sterile field into a sterile field.

## Construction of Agreed Upon Terms

The parties agreed to the construction of the following two terms in Claim 1

(Doc. 72, at p. 3):

| Claim Terms: | Agreed Upon Construction: |
|---|---|
| "accessing an instruction manual" | removing the instruction manual from the catheter package assembly |
| "instruction manual" | an arrangement of one or more pages of instructions addressing matters of concern to a health care services provider or to a patient, which relate to and arise before, during, or after the use of the catheter assembly |

## Construction of Disputed Claim Terms

The parties dispute the construction of the following two terms in

Claim 1 (Doc. 72, at p. 4):

**1.**     **"catheter assembly"**

| Medline's Proposed Construction: | Defendant's Proposed Construction: |
|---|---|
| "a medical device, having at least one complete 360-degree turn, that includes a catheter connected via tubing to a drainage receptacle" | "a unit containing a catheter and one or more parts such that the unit can be connected to a drainage receptacle" |

The disputed term "catheter assembly" was construed in the

*Medline I* case.  Defendant's proposed construction of that term in that case was "a

medical device that includes a catheter connected via tubing to a drainage

receptacle."  Exh. 7, Defendant's Opening Brief in *Medline I,* p. 2 (Doc. 73-8).

However, in the *Medline I* Court's January 11, 2019 claim construction Order,

adopted Plaintiff's construction but added the term "coiled" to modify "medical

device" so that Court's construction of "catheter assembly" was "a <u>coiled</u> medical

device that includes a catheter connected via tubing to a drainage receptacle."  Exh.

1, Plaintiff's Opening Brief, at p. 12 (Doc. 73-2).

A dispute between the parties concerning the interpretation of the term

"coiled" subsequently arose in the context of the parties' summary judgment

motions.  Defendant's position was that a "U-shape medical device" was

equivalent to a "coiled medical device." The *Medline I* Court, in its March 30,

2022 Order, issued a further construction that the phrase "coiled medical device"

meant "a medical device having at least one complete 360-degree turn." Exh. 6,

Plaintiff's Opening Brief, at p. 39 (Doc. 73-7). Thus, the final construction of

"catheter assembly" by the *Medline I* Court was "a medical device, having at least

one complete 360-degree turn, that includes a catheter connected via tubing to a

drainage receptacle." Plaintiff urges this Court to adopt that claim construction for

"catheter assembly."

However, as stated in *Johnson & Johnson Vision Care v. Ciba Vision Corp.*,

540 F. Supp.2d 1233, 1242 (M.D. Fla. 2008):

> While uniformity of treatment of a given patent is important,
> *Markman,* 517 U.S. at 390, and Judge [Lee's] previous
> decision [in *Medline I*] is entitled to "reasoned deference" under the
> broad principles of *stare decisis* and the goals articulated in
> *Markman,* the Court is not bound to automatically accept the claim
> construction by Judge [Lee]. . . . Rather, the Court has an
> independent obligation to determine the meaning of the claims, and to
> render its own independent claim construction. *See generally,*
> *McGinley v. Houston,* 361 F.3d 1328, 1331 (11th Cir. 2004) (The
> general rule is that a district judge's decision does not bind another
> district judge).

Defendant points out that both parties' constructions include the term

"catheter" and states that the parties agree on the "plain and ordinary meaning" of

"catheter," namely, "a tubular, flexible, surgical instrument that is inserted into a

cavity of the body to withdraw or introduce fluid. . . but the parties disagree about

what additional features a 'catheter assembly' must have." Defendant's Opening Brief, at p. 11. Defendant contends that the ordinary meaning of "assembly" is a "unit containing one or more parts" and, thus, its proposed construction of "catheter assembly" identifies a "unit" containing a catheter "and one or more parts" so that the unit can be connected to a "drainage receptacle."

The term "unit" does not appear in the '786 Patent. Also, although the term "parts/part" appears three times in the '786 Patent,[2] there is no identification of anything with "parts/part" that could be utilized in connecting the catheter with the drainage receptacle. While one "part" could possibly be the tubing interconnecting the catheter to the drainage receptacle/bag, what are the other "parts"?

The terms "unit" and "parts" in Defendant's proposed construction risk confusing the jury, because those terms "would [themselves] need to be defined." *Augme Tech., Inc. v. Yahoo! Inc.*, 2012 WL 10528 at *18 (N.D. Cal. 2012), *aff'd*, 2014 U.S. App. LEXIS 11606 (Fed. Cir. 2014). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips, supra*, 415 F.3d at 1316.

---

[2] "like numbers indicate like parts throughout the views" (Col. 1, l. 33-34); "various parts of the tray" (Col. 8, l. 38); and "a part of the fourth portion 2801" (Col. 16, line 13).

Defendant contends that the "catheter assembly" is just the catheter and does not necessarily include the tubing and the drainage receptacle while Plaintiff argues that the "catheter assembly" does comprise a catheter, a drainage receptacle and tubing connecting the catheter to the receptacle. A basis for Plaintiff's proposed construction is that the '786 Patent refers to the catheter assembly by the reference number 700 but there are no reference numbers for either the tubing or the drainage receptacle. *See, e.g.,* Figs. 7, 8 (which shows a portion of the drainage receptacle), 9, 10, and 14 (which shows the tubing).

Figure 16, along with Figures 14, 15 and 17-19, depict "exemplary panels of printed instructions" (Col. 2, l. 63-64) that "provide the health care services provider with information regarding the use of the catheter assembly." Col. 22, l. 20-23. The "printed instructions" comprise the claimed "instruction manual" that is accessed by the user in accordance with the second step of the method of Claim 1 of the '786 Patent. *See,* Col. 26, l. 65.

Defendant also argues that the '786 Patent specification states, at Col. 22, l. 35-36, that "Step 1605 [in Figure 16] directs the health care services provider to secure the drainage bag to the catheter assembly" to support its position that the catheter assembly does not include the tubing and drainage bag. However, the instructions in Step 1605 of Figure 16 are not the securing of "the drainage bag to

the catheter assembly" but the securing of the "drainage bag to bed . . . . Assure tubing does not have dependent loop.  Do not allow the bag to touch the floor."

Defendant also relies on another misstatement in the specification referring to Figure 16: "Step 1607 provides instructions on completing the label on the Foley insertion tag . . . and attaching it to the tubing or drain bag attached to the catheter assembly."  Col. 22, l. 38-41.  However, Step 1607 in Figure 16 states: "4c.  Place time, date and signature on yellow 'Foley InserTag' and wrap around drain tubing above the area of the drainage bag" with no reference to the catheter assembly.

Additional support for the construction of "catheter assembly" as comprising a catheter, tubing and a drainage receptacle/bag is shown in the '786 Patent at Col. 5, l. 21-39 which sets out that "the tray 100 is configured to hold not only the catheter assembly, but the medical devices corresponding to catheter use as well" and goes on to identify several "medical devices" (*e.g.*, syringes, skin cleansing materials, towels, rubber gloves, hand sanitizing materials, and a printed instruction manual), but does not cite tubing or a drainage receptacle/bag as being any of such "medical devices."

Defendant's expert, Karl R. Leinsing, also supports Plaintiff's proposed construction of "catheter assembly" when he stated in his Declaration (Exh. 4, Defendant's Opening Brief, at ¶ 36 (Doc. 74-5) (emphasis added), that

> [a]n "assembly" is a common English word. "Assembly" is defined as "the fitting together of manufactured parts into a complete machine, structure, or unit of a machine" or "a collection of parts so assembled." . . . The patents-in-suit each claim a "catheter assembly" that is disposed inside a tray. Thus, <u>"catheter assembly"</u> as used in the claims <u>refers to a collection of assembled parts</u> as opposed to the act of fitting together parts. In particular, <u>I understand "assembly" in the term "catheter assembly" to indicate that a catheter is attached to one or more other parts.</u>

Defendant's proposed construction of "catheter assembly" states what could be possible ("a catheter and one or more parts . . . that . . . <u>can be connected</u> to a drainage receptacle") while Defendant's expert's construction is more definitive ("a catheter <u>is attached</u> to one or more parts") and is in accord with Plaintiff's construction that "a catheter [is] <u>connected</u> via tubing to a drainage receptacle." It is noted that Defendant's expert's Declaration was submitted in the *Medline I* case in support of Defendant's then-proposed construction of "catheter assembly" as "a medical device that includes a catheter connected via tubing to a drainage receptacle."

Finally, Defendant objects to the portion of Plaintiff's proposed construction that states that the "medical device" has "at least one complete 360-degree turn." The phrase "at least one complete 360-degree turn" was adopted by the *Medline I* Court in lieu of the term "coiled" but is not found in the '786 Patent. However, there are six instances where the term "coiled" appears in the 786 Patent:

Abstract:
A tray(100) for accommodating a <u>coiled medical device,</u> such as a catheter
assembly (700). . . .

Col. 1, l. 48-51:
[C]atheter assemblies and other flexible equipment is generally shipped in a <u>coiled</u>
configuration.

Col. 3, l. 59-65:
In an illustrative embodiment, <u>the medical device is a coiled device,</u> such as a
catheter or catheter assembly. In addition to accommodating the <u>coiled medical</u>
<u>device,</u> embodiments of the present invention are also configured to contain
devices and materials intended for use with the <u>coiled medical device.</u>

Col. 9, l. 4-5:
The second compartment 102 is configured to accommodate a <u>coiled medical</u>
<u>device,</u> such as catheter assembly 700.

     Additionally, Defendant's own expert, Mr. Leinsing, opined in his

Declaration, at paragraph 57, that the medical device of the '786 Patent is coiled in

the tray:

> Figures 7, 8, and 10 [of the '786 Patent] show the catheter arranged in
> a coiled configuration inside the tray. This arrangement is consistent
> with statements in the specification indicating that the catheter is
> arranged in a coiled configuration while inside the package and
> uncoiled when taken out of the package: "Once the sterile packaging
> is removed, the catheter must be uncoiled prior to use." (. . . '786
> Patent[] at 1:50-51.). . . .

     Defendant argues that that the examples of "coiled" in the '786 Patent

specification are "non-limiting examples," that the "disclosed 'coiled medical

device' is simply one 'embodiment' of the invention, and the invention is not

limited to that specific disclosed embodiment" and that "[t]he specification makes

clear that the coiled medical device is merely an 'illustrative' example in the

specification." Defendant's Opening Brief, at p. 18. It bases that argument on the

following statements in the '786 Patent specification: "[C]atheter assemblies and

other flexible equipment is generally shipped in a coiled configuration" (Col. 1,

l. 48-51) and "[i]n an illustrative embodiment, the medical device is a coiled

device. . . ." Col. 3, l. 60-61(emphasis added). To Defendant, the use of

"generally" and "illustrative embodiment" means that a coiled medical device

"does not define the invention" and that "the specification specifically

contemplates a situation where the catheter assembly is not coiled. . . ."

Defendant's Opening Brief, at pages 14 and 15.

Defendant's own expert, Mr. Leinsing, contradicts Defendant's argument by

the following statements in paragraph 4 of his Declaration:

> My designs using catheters, as mentioned previously, are becoming
> more and more common as procedures become less invasive and use
> the femoral artery or vein in the leg to get to remote locations in and
> around the heart. I have worked on inventions and designs using this
> approach and these catheters require long lengths and small size
> devices. The length of these catheters, like standard guide wires,
> requires the catheter to be coiled in the packaging. My inventions and
> experience includes such guide catheters and use of such associated
> packaging. (Emphasis added).

It's noted that Mr. Leinsing is not referring to urinary catheters, but it can be

assumed that the length of tubing connecting the catheter to the drainage

receptacle, alone, would require the catheter assembly to be "coiled in the

23

packaging" so that the catheter is not "inadvertently bent, kinked or otherwise damaged. . . ." '786 Patent, at col. 1, l. 52-54.

Since "the trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties,"[3] "[t]he Court suggests its own simpler definition"[4] of "catheter assembly," namely, -- *a coiled medical device that includes a catheter connected via tubing to a drainage receptacle* --.

2.  **"reveal"/ "reveal an additional layer of wrap and the catheter assembly"**

| Medline's Proposed Construction: | Defendant's Proposed Construction: |
|---|---|
| "to make visible or to make (something that was hidden) able to be seen" / "to make an additional layer of wrap and the catheter assembly visible or able to be seen" | "to make visible or able to be seen any portion of the catheter assembly"  <br><br> in the alternative, indefinite |

The step in Claim 1 of the '786 Patent wherein the contested term/phrase occurs reads as follows: "unfolding one or more layers of wrap to reveal an additional layer of wrap and the catheter assembly." Support for that step is described in the patent specification at Col. 26, l. 5-18, as follows:

---

[3] *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995), *cert. denied,* 518 U.S. 1020 (1996).
[4] *Sliding Door Company v. KLS Doors, LLC*, 2014 WL 12591675, at n. 19 (C.D. Cal. 2014).

> . . . At FIG. 31, a health care services provider 3101 opens the outer bag 2902 that is disposed about the tray 100 and removes the bag to <u>reveal the packaged catheter assembly</u> 2901 therein. . . .

> The health care services provider 3101 can then unfold the one or more layers of wrap material 2200.  <u>Where an additional layer of wrap material 2701 is included, this unfolding step reveals and makes accessible the additional layer of wrap material 2701.</u>  Note that portions of the additional layer of wrap material 2701 may be visible, as shown in FIG. 29, prior to the steps of unfolding.

Adopting Defendant's proposed construction ("to make visible or able to be seen any portion of the catheter assembly") would impermissibly read out of Claim 1 the limitation that the unfolding step in the claim includes revealing not only the catheter assembly, but also "an additional layer of wrap" material 2701.  However, during the hearing, Defendant's counsel stated that "in our responsive brief we make clear that we were not trying to read an additional layer of wrap out of the claim and that the reveal limitation applies equally to additional layer of wrap as it does to catheter assembly."  Hearing Transcript, at p. 77, l. 17-21.

According to Defendant, the issue between the parties with regard to the word "reveal"

> is not whether "reveal" means "to make visible or to make able to be seen" (with which Defendant agrees) but rather, whether "reveal[ing]" a "catheter assembly" requires revealing "any portion" of the catheter assembly or instead whether the "reveal" step requires revealing a "reasonable" (but undefined) amount of the catheter assembly. . . . The specification makes clear that if a user is able to see a partial view of the catheter assembly, then revealing such view of the catheter assembly, no matter how small, is the construction of the term and a full view is not required.

25

> However, if the Court were to find that "reveal an additional
> layer of wrap and the catheter assembly" is not met by making
> any portion of the catheter assembly visible, then the term is
> indefinite because there would be no objective way to determine what
> constitutes revealing the catheter assembly and the additional layer of
> wrap. . . .

Defendant's Response Brief, at pp. 19-20.

Plaintiff states that the "parties agree, as a matter of claim construction, that

the claims do not require the *entire* catheter assembly to be visible. . . . Defendant

wants the Court to go further and to decide, as a matter of claim construction,

precisely 'how much' of the catheter assembly and wrap must be uncovered. . . to

count as being 'revealed.'"   Plaintiff's Response Brief, at pp. 19, 20 (emphasis in

the original).

The definiteness requirement of a claim is found at 35 U.S.C. § 112,

¶ 2 which requires that

> "[t]he specification shall conclude with one or more claims
> particularly pointing out and distinctly claiming the subject matter
> which the inventor or a joint inventor regards as the invention." . . .
> This provision strikes a "delicate balance" which recognizes that,
> although the definiteness requirement must tolerate "[s]ome modicum
> of uncertainty" as "the price of ensuring the appropriate incentives
> for innovation," . . . a patent must nevertheless "be precise enough
> to afford clear notice of what is claimed, thereby apprising the public
> of what is still open to them."

*Cox Communications, Inc. v. Sprint Communications Co, LP*,  838 F.3d 1224,
1229 (Fed. Cir. 2016).

It is recommended that this Court "tolerate '[s]ome modicum of uncertainty'"" and not precisely determine how much of the catheter assembly and wrap must be uncovered in order to be "revealed." In doing so, the term "reveal" "does not render [Claim 1] indefinite because it does not prevent the claim[], read in light of the specification and the prosecution history, from informing those skilled in the art about the scope of the invention with reasonable certainty." *Id.* at p. 1233.

Plaintiff's proposed construction of "reveal" is "to make visible or to make (something that was hidden) able to be seen" which, in view of the redundant phrase "something that was hidden," is "unnecessarily wordy. . . and may confuse the jury." *TracBeam, L.L.C. v. AT&T, Inc.*, 2013 WL 250532, at *11 (E.D. Tex. 2013). Common sense would dictate that if something is made to be "visible" that, previously, it was "hidden" from view. Also, the wording "to make visible or to make . . . able to be seen" in the construction of "reveal" should be changed to "to make visible . . . or able to be seen" in order to conform to the same wording appearing in the construction of "reveal an additional layer of wrap and the catheter assembly," namely, "to make an additional layer of wrap and the catheter assembly visible or able to be seen."

Therefore, it is recommended that the construction of "reveal"/ "reveal an additional layer of wrap and the catheter assembly" is -- *to make visible or able to*

Therefore, it is recommended that the construction of "reveal"/ "reveal an additional layer of wrap and the catheter assembly" is -- *to make visible or able to be seen / to make an additional layer of wrap and the catheter assembly visible or able to be seen --*.

## Conclusion

For the reasons stated herein, the following is recommended:

1.    The qualifications of a person of ordinary skill in the art by the relevant time of the '786 Patent are -- *one who would have a bachelor's degree in mechanical engineering or equivalent technical degree and at least two years of experience in the medical device packaging field --*.

2.    The construction of "catheter assembly" is -- *a coiled medical device that includes a catheter connected via tubing to a drainage receptacle --*.

3.    The constructions of "reveal"/ "reveal an additional layer of wrap and the catheter assembly" are -- *to make visible or able to be seen / to make an additional layer of wrap and the catheter assembly visible or able to be seen --*.

Date:  May 2, 2023

_____
William H. Needle
Special Master